IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE; THE WILDERNESS SOCIETY; and NATURAL RESOURCES DEFENSE COUNCIL,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; JUAN PALMA, Utah State Director; JERRY KENCZKA, Assistant Vernal Field Office Manager; and KENT HOFFMAN, Deputy State Director,<br><br>Defendants,<br><br>and<br><br>GASCO ENERGY, INC.,<br><br>Intervenor-Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' AND INTERVENOR-DEFENDANT'S MOTIONS TO DISMISS** (ECF No. 41, 42)<br><br>Case No. 2:13-cv-01060-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Defendants United States Department of the Interior, United States Bureau of Land Management, Juan Palma, Jerry Kenczka, and Kent Hoffman (collectively, the "BLM") and Intervenor-Defendant Gasco Energy, Inc. ("Gasco") move the Court[1] to dismiss Plaintiffs Southern Utah Wilderness Alliance, The Wilderness Society, and Natural Resources Defense Council's (collectively, "SUWA's") Second Amended Complaint for lack of standing. (ECF No. 41, 42.) Alternatively, the BLM and Gasco argue the Court should dismiss part of SUWA's

---

[1] On May 7, 2014, in accordance with United States District Court for the District of Utah General Order 07-001 and Federal Rule of Civil Procedure 73, the parties consented to have this case decided by the undersigned Magistrate Judge. (ECF No. 26.)

1

Second Amended Complaint for failure to state a claim. (*Id.*) SUWA alleges the BLM violated the National Environmental Policy Act ("NEPA") and the Fair Land Policy and Management Act ("FLPMA") when it approved Gasco's Uinta Basin oil and gas development projects without following proper procedures. (ECF No. 31.)

## I. STANDARD OF REVIEW

The parties dispute what standard of review the Court should use in evaluating the jurisdictional challenges to SUWA's Second Amended Complaint at the motion to dismiss stage. Although all parties agree SUWA bears the burden of proof, the parties disagree on what the Court should accept as true. (BLM's Mot. to Dismiss 7, ECF No. 42; Gasco's Mot. to Dismiss 11, ECF No. 41; Opp'n x, ECF No. 54.) The BLM and Gasco both argue that in this circumstance the Court cannot "'presume the truthfulness of the complaint's factual allegations.'" (Gasco's Mot. to Dismiss 11 (citation omitted), ECF No. 41; *see also* BLM's Mot. to Dismiss 7 (citation omitted), ECF No. 42). SUWA argues the exact opposite. (Opp'n ix, ECF No. 54.)

*Holt v. United States* distinguishes between two types of Rule 12(b)(1) motions to dismiss:

> [A] facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. . . . [A] party [however] may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.

46 F.3d 1000, 1002–03 (10th Cir. 1995) (citations omitted); *see also* 5B Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1350 at 147–198 (3d ed. 2015). In this case, neither the BLM nor Gasco puts forth any evidence to suggest SUWA makes false allegations.

2

Rather, the BLM and Gasco make facial attacks challenging the sufficiency of SUWA's allegations, arguing that those allegations, without more, do not state Article III standing. Thus, the Court will accept the allegations in SUWA's Second Amended Complaint as true.

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Additionally, a court must "assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted." *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135–36 (10th Cir. 2014) (citation and internal quotation marks omitted).

## II. FACTS

With this standard of review, the Court recites the facts as alleged in SUWA's Second Amended Complaint.

In February 2006, the BLM published a notice of intent to prepare an environmental impact statement regarding Gasco's proposal for natural gas drilling, exploration, and development in the Uinta Basin ("EIS"). (Second Am. Compl. ¶¶ 2, 78, ECF No. 31.) Gasco's proposal (the "Uinta Basin project") includes approximately 206,826 acres, (BLM's Mot. to Dismiss Ex. A, ECF No. 42-1 at 7),[2] bounded by the Green River on the east, Monument Butte oil field on the north, Ashley National Forest on the west, and Nine Mile Canyon on the south,

---

[2] Exhibit A to the BLM's Motion to Dismiss is the Record of Decision for Gasco's Uinta Basin Project ("ROD"). "A district court may consider documents (1) referenced in a complaint that are (2) central to a plaintiff's claims, and (3) indisputably authentic when resolving a motion to dismiss without converting the motion to one for summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014). The ROD qualifies for the Court's consideration under this standard.

(Second Am. Compl. ¶ 34, ECF No. 31).  SUWA submitted comments in response to the BLM's notice of intent.  (*Id.* ¶ 78.)

In October 2010, the BLM released a draft EIS analyzing the proposed action and four alternatives.  (*Id.* ¶ 79.)  The BLM preferred the proposed action.  (*Id.*)  SUWA, and many others, including the Environmental Protection Agency, submitted comments identifying inadequacies in the draft EIS.  (*Id.* ¶¶ 80–87.)  In March 2012, the BLM released the final EIS analyzing a new alternative that the BLM preferred.  (*Id.* ¶¶ 91, 93.)  The preferred alternative allows Gasco to drill up to 1298 new gas wells from 575 new well pads, build 198 miles of roads and 316 miles of pipelines, expand two existing compressor facilities, and construct a new evaporative facility with up to twelve evaporative basins.  (BLM's Mot. to Dismiss Ex. A, ECF No. 42-1 at 8, 16–17.)  The BLM estimated the Uinta Basin project would disturb a total of 3604 acres over its lifespan.  (*Id.* at 16.)  Shortly after the release of the final EIS, SUWA sent the BLM letters regarding the agency's failure to consider three recently released guidance documents and other environmental issues.  (Second Am. Compl. ¶¶ 98–112, ECF No. 31.)

The BLM issued the Record of Decision approving its preferred alternative for the Uinta Basin project ("ROD") in June 2012.  (*Id.* ¶¶ 113–14.)  Although the BLM made no substantive changes to its preferred alternative, (*id.* ¶ 114), the ROD requires Gasco to obtain additional approval before starting any surface-disturbing activities, thus triggering another round of NEPA analysis, (BLM's Mot. to Dismiss Ex. A, ECF No. 42-1 at 11).  The ROD explicitly states it

> does not specifically authorize site-specific construction, maintenance, or use of new wells, pads, pipelines, or other facilities on BLM-administered lands.  Rather, the proponent or affiliate is required to submit APDs, Sundry Notices, and right-of-way applications for approval of wells, well pads, pipelines, roads, evaporative basins, or other ancillary facilities associated with project development.  Site-specific National Environmental Policy Act (NEPA) review and approval of such applications is required prior to initiating surface-disturbing activities within the analyzed development area.

(*Id.*)

In 2014, Gasco applied for permission to drill sixteen new gas wells from three existing well pads (the "Sixteen-Well project"). (BLM's Mot. to Dismiss 6, ECF No. 42.) That spring, the BLM released a draft environmental assessment regarding Gasco's proposal ("EA"). (Second Am. Compl. ¶ 128, ECF No. 31.) The Sixteen-Well project lies approximately twenty-six miles southeast of Myton, Utah, (Gasco's Mot. to Dismiss Ex. 3, ECF No. 41-3 at 3), and half a mile from the Green River near Sheep Wash, (Second Am. Compl. ¶ 49, ECF No. 31). The draft EA analyzes the proposed action and a no-action alternative. (*Id.* ¶ 128.) SUWA submitted comments complaining about the inadequacies of the draft EA, including its prior criticisms of the EIS because the draft EA relies on analysis in that document. (*Id.* ¶¶ 129–133.)

In July 2014, the BLM released the final EA and issued a Decision Record and Finding of No Significant Impact approving the Sixteen-Well project ("DR/FONSI") without making significant changes to the draft EA. (*Id.* ¶ 134.) SUWA requested the BLM's Utah State Director review the EA and the DR/FONSI. (*Id.* ¶ 135.) In August 2014, the Deputy State Director affirmed the EA and the DR/FONSI. (*Id.* ¶ 137.)

### III. PROCEDURAL HISTORY

SUWA filed its Complaint at the end of 2013, alleging NEPA and FLPMA violations relating to an environmental assessment, decision record, and finding of no significant impact that analyze Gasco's proposal to drill six oil wells from six existing well pads (the "Six-Well EA and DR/FONSI"). (ECF No. 2.) In early 2014, Gasco filed a Motion to Intervene, (ECF No. 10), which the Court granted, (ECF No. 17). SUWA then amended its Complaint twice, once in February 2014, (ECF No. 18), and again in November 2014, (ECF No. 31). The first amendment added NEPA and FLPMA claims relating to the EIS and the ROD. (ECF No. 18.) The second

amendment added NEPA and FLPMA claims relating to the Sixteen-Well EA and DR/FONSI. (ECF No. 31.) The BLM and Gasco filed their Motions to Dismiss in January 2015.[3] (ECF No. 41, 42.) On June 5, 2015, the Court heard oral arguments from the BLM, Gasco, and SUWA. (ECF No. 66.) At the hearing, the parties agreed to dismiss all claims against the Six-Well EA and DR/FONSI.

The BLM argues SUWA lacks Article III standing because the EIS and the ROD do not cause "'concrete' or 'real and immediate'" injuries-in-fact as they do not "authorize any environmental harm at all" without further NEPA analysis. (BLM's Mot. to Dismiss 9–10, ECF No. 42.) Additionally, the BLM argues the Court cannot grant SUWA's requested relief because the EIS and the EA do not constitute "final agency actions" under the Administrative Procedure Act ("APA"), which authorizes courts to act in NEPA and FLPMA suits. (*Id.* at 10, 11 n.1.) Gasco also argues SUWA lacks Article III standing but for different reasons. Gasco contends SUWA's Second Amended Complaint lacks the specificity to allege "discernable, concrete injuries-in-fact," (Gasco's Mot. to Dismiss 12, ECF No. 41), and fails to show Gasco caused the alleged injuries, (*id.* at 22).

Finally, both the BLM and Gasco argue, in the alternative, that SUWA fails to state a claim under FLPMA. The BLM contends its decisions to approve the Gasco project and the Sixteen-Well project do not contravene the governing resource management plan ("RMP"), while Gasco contends SUWA's allegations do not make out an actual cause of action under FLPMA.

---

[3] Although the BLM filed a separate Motion to Dismiss, it also joins Gasco's Motion to Dismiss. (BLM's Mot. to Dismiss 2, ECF No. 42.) For clarity, the Court will attribute arguments to their originating party.

The Court finds the EIS and the EA do not qualify as "final agency actions" under the APA.  Further, the Court finds the ROD does not cause "concrete" or "real and immediate" injuries-in-fact.  The Court also finds SUWA's Second Amended Complaint specific enough to allege "discernable, concrete injuries-in-fact" as to the remaining claims regarding the DR/FONSI.  Additionally, SUWA does not need to trace its injuries back to Gasco.  Rather, it correctly traces its alleged injuries back to the BLM's failure to follow proper NEPA procedures.  Finally, the Court finds that SUWA does not allege a proper cause of action under FLPMA.  For these reasons, the Court dismisses SUWA's claims against the EA, the EIS, the ROD, and the Six-Well EA and DR/FONSI but not SUWA's claims against the Sixteen-Well DR/FONSI.

## IV. DISCUSSION

### A.  "Final Agency Action"

Because neither NEPA nor FLPMA provides for a private cause of action, a plaintiff must bring such suits under the APA.  *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998).  In those cases, courts may only review and act upon "final agency action."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004) ("Where no other statute provides a private right of action, the 'agency action' complained of must be '*final* agency action.'"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'").

The BLM argues that the EIS and the EA do not constitute "agency actions" under the APA, much less "final agency actions," because they compile "information and do[] not decide anything."  (BLM's Mot. to Dismiss 10–11, 11 n.1, ECF No. 42.)  The Court agrees.

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The APA further defines each term:

1) A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

2) An "order" is "a final disposition . . . of an agency in a matter other than rule making." 5 U.S.C. § 551(6).

3) A "license" is "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8).

4) A "sanction" requires some "compulsory or restrictive action." 5 U.S.C. § 551(10)(G).

5) "Relief" requires "taking [some] action on the application or petition of, and beneficial to, a person." 5 U.S.C. § 551(11)(C).

By definition, the EIS and the EA do not fit under any of these categories. In general, an environmental impact statement is "a detailed statement" that includes information on the environmental impacts of the proposed action and an analysis of possible alternatives. 42 U.S.C. § 4332(2)(C). An environmental impact statement serves two purposes:

> First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (alteration in original) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). Similarly, an

8

environmental assessment includes information on the environmental impacts of a proposed action and an analysis of possible alternatives but in a "concise public document." *See* 40 C.F.R. § 1508.9. An environmental assessment serves a few purposes: "(1) Briefly provid[ing] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. (2) Aid[ing] an agency's compliance with [NEPA] when no environmental impact statement is necessary. (3) Facilitat[ing] preparation of a statement when one is necessary." 40 C.F.R. § 1508.9(a).

According to these definitions, an environmental impact statement and an environmental assessment do not make decisions or take actions that affect a person in the ways contemplated by the APA's definition of agency action. Rather, they constitute informational documents that help enlighten agencies in making decisions. For this reason, the Court finds that neither the EIS nor the EA constitutes a "final agency action" under the APA, and thus the Court cannot "declare [them] unlawful and set [them] aside" or prohibit the BLM from relying on them as requested by SUWA, (*see* Second Am. Compl. 33–34, ECF No. 31). Thus, SUWA fails to state a claim upon which this Court can grant relief as to the EIS and the EA.

### B. Article III Standing

To establish standing,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and [(3)] it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To establish organizational standing, the organization's "members [must] otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181.

The parties only contest the first element of organizational standing. Thus, if SUWA can establish Article III standing through Ray Bloxham, a member whose declaration SUWA attaches to its Second Amended Complaint, it will establish organizational standing as well.

### 1. The ROD

The BLM challenges SUWA's standing to bring its claims against the ROD because it asserts the ROD causes no injury-in-fact. (BLM's Mot. to Dismiss 9–10, ECF No. 42.) The Court agrees.

To establish injury-in-fact in NEPA suits, a plaintiff must allege facts that "show that in making its decision without following [NEPA] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). SUWA's allegations against the ROD do not meet this standard, because they do not sufficiently allege an "increased risk of actual, threatened, or imminent environmental harm" stemming from the ROD.

Although the ROD approves the Uinta Basin project, it explicitly states that it "does not specifically authorize site-specific construction, maintenance, or use of new wells, pads, pipelines, or other facilities." (BLM's Mot. to Dismiss Ex. A, ECF No. 42-1 at 11.) Instead, the

10

ROD requires another step before Gasco can do anything: Gasco must obtain additional approvals and go through another round of NEPA analysis. Without immediate permission to disturb the surface, no increased risk of environmental harm occurs with the issuance of the ROD. Additionally, the extra round of NEPA analysis prevents any harm from being "actual, threatened, or imminent," because the BLM may disapprove a site-specific proposal thus barring Gasco from changing anything. Until the BLM gives Gasco specific additional permission, the BLM has not approved any change to the environment based on the ROD.

The BLM conceded Gasco could still challenge the ROD in certain circumstances. At the hearing, the BLM stated that when subsequent NEPA analyses for site-specific projects rely on a broad, programmatic environmental impact statement, such as this EIS, a plaintiff may challenge those portions of the environmental impact statement and the process leading up to the statement in addition to challenging the NEPA analysis done for the site-specific project. Because SUWA failed to establish injury-in-fact from the ROD, it cannot establish standing for the claims related to the ROD.

## 2. The DR/FONSI

Gasco challenges SUWA's standing to bring any of its claims because it asserts SUWA has failed to provide sufficiently specific allegations of injury-in-fact and causation to survive a motion to dismiss. (Gasco's Mot. to Dismiss 12–23, ECF No. 41.) The Court disagrees.

Regarding injury-in-fact, the plaintiff must allege facts showing an "increased risk of actual, threatened, or imminent environmental harm," and "that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action" to satisfy the injury-in-fact requirement. *Rio Hondo*, 102 F.3d at 449; *see also Palma*, 707 F.3d at 1155–56. At the motion to dismiss stage,

"general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Palma*, 707 F.3d at 1152 (citations and internal quotation marks omitted).

SUWA relies on Mr. Bloxham's declaration to establish its injuries-in-fact from the Sixteen-Well project. Mr. Bloxham states that "SUWA, members and staff enjoy recreation, sightseeing, birdwatching, photography, and other activities in the affected lands and immediately adjacent lands" and that these interests will suffer harm from "air pollution, . . . greenhouse gas emissions, . . . and degradation of the natural environment." (Ray Bloxham Decl. ¶ 6, ECF No. 31-1.) Further, he specifically states the following regarding his visits to "the public lands surrounding the [Sixteen-Well] project area":

> 8. I enjoy my visits to this area. During my visits I enjoy the incredible views of the lands, the clean air found in these areas, the remote nature of the area, the abundant wildlife, and the native and endemic vegetation. My travels throughout the Uinta Basin have also led me through Myton and Ouray countless times; I have come to greatly appreciate the character of these communities and the people living there. Naturally, while passing through these areas I enjoy the clean drinking water found in the local communities. In June 2014, I visited the area of the Uinta Basin surrounding the area of the Sixteen-Well EA . . . passing through Eightmile Flat and Myton, while observing the air quality of the region. Prior to this specific occasion, I frequently visited, viewed, and appreciated this area during my regular visits to this region which occurred on average two to four times per year from 2000–2011. I intend to return to these lands as often as possible and intend to return again within the next year.
>
> . . .
>
> 11. My health, recreational, spiritual, educational, aesthetic, and other interests will be directly affected and irreparably harmed by the BLM's decision to allow the development considered in the . . . Sixteen-Well EA without fully analyzing and disclosing the impacts of this decision and in approving unacceptable levels of pollution.
>
> 12. I also enjoy the opportunities for recreation on the Green River, of which, clean water, the natural setting, and lack of human sights and sounds are an

> integral component. I have rafted, canoed, or kayaked the Green River in this area many times between 2000 and the present date. . . . [O]ne visit in October 2009, I floated the Green River in the project area—beginning at the Pariette Draw area and taking out at Sand Wash. During that trip, unfortunately, I heard a number of different oil and gas facilities or development related to oil and gas extraction. Some of this activity was taking place miles from the river. The noise created by these activities detracted from my experience and marred the natural setting. I expect that if Gasco drills the [sixteen] wells at issue the sound of drilling and other development activity will be audible from the river. I will not visit the river during drilling because of the adverse impact it would have on any float trip. In addition, I fear that well site activity after drilling is completed may be audible on the Green River and will adversely affect my recreational experience. I prize the natural soundscape of this area and anything that detracts from that soundscape affects my recreational experience.

(Bloxham Decl. ¶¶ 8, 11–12, ECF No. 31-1.)

Mr. Bloxham alleges enough to make out an "increased risk of actual, threatened, or imminent environmental harm." In *Palma*, the Tenth Circuit noted "that Mr. Bloxham's declarations are more than sufficient to establish SUWA's injury at the pleading stage." 707 F.3d at 1156. Those declarations included the following statements:

> [During trips to the Circle Cliffs Special Tar Sand Area,] I hiked in Little Death Hollow Canyon, drove the Wolverine Loop road, camped under the Circle Cliffs, and explored Moody and Middle Moody Canyons and Colt Mesa. In that area I have also explored the Pioneer Mesa and Studhorse Peaks proposed wilderness units and have taken scenic tours of the area. I have enjoyed the solitude, scenery, and opportunities for primitive recreation in the area. Like much of the Grand Staircase-Escalante National Monument, the Circle Cliffs [Special Tar Sand Area] is remote and quiet. It is etched with canyons, complimented by expansive views, and beautifully still.
>
> . . .
>
> [D]evelopment within the Circle Cliffs [Special Tar Sand Area] "would destroy the incredible character of this unique and picturesque area." "My health, recreational, spiritual, educational, aesthetic, and other interests are directly affected and irreparably harmed by the BLM['s] . . . decision[] to retroactively suspend the thirty-nine leases at issue in this litigation and the associated development, either conventional or unconventional, that could result in these areas . . . ."

13

*Id.* at 1154 (citations omitted). Mr. Bloxham's declaration here has the same level of specificity as his declarations in *Palma*. Therefore, his declaration here also demonstrates an increased risk of injury-in-fact.

Additionally, Mr. Bloxham sufficiently alleges a geographical nexus to the Sixteen-Well project when he states he has gone to Myton and Ouray multiple times, visited Eightmile Flat, and rafted down the Green River past the Sixteen-Well project area. (Bloxham Decl. ¶¶ 8, 12, ECF No. 31-1.) The Sixteen-Well project lies only twenty-six miles southeast of Myton, Utah, (Gasco's Mot. to Dismiss Ex. 3, ECF No. 41-3 at 3), and a half a mile from the Green River near Sheep Wash, (Second Am. Compl. ¶ 49, ECF No. 31). In *Palma*, the Tenth Circuit stated that "[n]either our court nor the Supreme Court has ever required an environmental plaintiff to show it has traversed each bit of land that will be affected by a challenged agency action. . . . Mr. Bloxham's declarations go beyond the general factual allegations needed at the pleading stage. As his affidavits described in detail, he has traveled extensively through these [areas and] has traversed through or within view of the parcels of land where oil and gas development will occur." 707 F.3d at 1155–57. Similarly, in *Rio Hondo*, the Tenth Circuit held that plaintiffs who "live[d] twelve to fifteen miles downstream" from the affected area and "have used the waters of the Rio Hondo watershed for their entire lifetimes" established a geographical nexus. 102 F.3d at 450. Air pollution does not affect only the immediate site of discharge; rather it flows out from that area. While at some distance clean air will dilute the pollution to a level of an unrecognizable harm or other barriers will prevent the spread of the pollution, half a mile falls within a close enough zone to allege a geographical nexus. This precedent supports the finding that Mr. Bloxham has traveled,

14

and will travel, close enough to the Sixteen-Well project to allege a geographical nexus for purposes of standing at the motion to dismiss stage.

SUWA's Second Amended Complaint also sufficiently alleges that the BLM's flawed NEPA process caused its injuries-in-fact. "To establish causation [for a NEPA claim], a plaintiff need only show its increased risk is fairly traceable to the agency's failure to comply with [NEPA]." *Id.* at 451. "Under [NEPA], an injury results not from the agency's decision, but from the agency's *uninformed* decisionmaking. The increased risk of adverse environmental consequences is due to the agency's 'failure substantively to consider the environmental ramifications of its actions in accordance with [NEPA.]'" *Id.* at 452 (citations omitted).

Gasco argues that even if SUWA successfully alleges concrete injuries-in-fact, SUWA cannot trace its alleged injuries back to Gasco. (Gasco's Mot. to Dismiss 22–23, ECF No. 41.) However, SUWA need not allege its injuries trace back to Gasco; rather, it must allege that the BLM's flawed decision-making process may cause the injuries. *See Rio Hondo*, 102 F.3d at 451–52. SUWA successfully makes this connection and alleges causation when it asserts that the EA inadequately analyzes the impacts on air quality and ozone levels, ignores the social cost of greenhouse gas emissions, and fails to analyze the impacts of the Sixteen-Well project on river recreationists. (Second Am. Compl. ¶ 135, ECF No. 31.) Additionally, the EA relies on the EIS, which has its own alleged shortcomings, including failing to use a newly published guidance document, the Greater Uinta Basin Oil and Gas Cumulative Impacts Technical Support Document, in its analysis; using outdated data; and failing to analyze suggested sources of pollution. (*Id.* at ¶¶ 94–97, 108–09, 130–31.) SUWA alleges this uninformed decision-making led to

15

the BLM's decision to approve the Sixteen-Well project, which in turn injured SUWA. Thus, SUWA sufficiently alleges its injuries-in-fact from the DR/FONSI can trace back to the BLM's flawed NEPA process.

The Court further notes any requirement that SUWA provide factual support to prove Gasco's projects will increase air pollution would turn NEPA on its head. "To require that a plaintiff establish that the agency action will result in the very impacts an environmental impact statement is meant to examine is contrary to the spirit and purpose of [NEPA]." *Rio Hondo*, 102 F.3d at 452. Moreover, any such requirement would encourage introduction of new evidence not in the administrative record—a consequence not contemplated in an administrative appeal.

Finally, should SUWA prevail, the Court can redress SUWA's injuries-in-fact. The Court can take action on the DR/FONSI under the APA, declaring it unlawful or setting it aside if the Court finds it "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(a)—relief SUWA seeks. (Second Am. Compl. 33–34, ECF No. 31.)

Therefore, SUWA has sufficiently alleged standing to survive a motion to dismiss its NEPA claims against the DR/FONSI.

### C.  FLPMA

SUWA alleges that "BLM's failure to provide for compliance with relevant air . . . quality standards prior to approving the . . . Sixteen-Well EA violates FLPMA." (Second Am. Compl. ¶ 165, ECF No. 31.) Although SUWA bases its claim on both 43 U.S.C. §§ 1712(c)(8)

and 1732(a),[4] SUWA emphasizes that "[t]he critical component of [its claim] flows from 43 U.S.C. Section 1732(a)." (Opp'n 23, ECF No. 54.) "Since these land use plans must provide for compliance with state and federal air . . . quality standards, BLM is, therefore, required by statute to provide for compliance through its authorizations and daily management." (*Id.* (citing 43 U.S.C. §§ 1712(c)(8) and 1732(a)).) At the hearing, SUWA clarified that it believes the BLM's issuance of the DR/FONSI itself violated FLPMA because the Sixteen-Well project violates air quality standards. SUWA insisted it does not allege the BLM's issuance of the DR/FONSI contravenes the relevant RMP. SUWA cannot allege contravention of the RMP because the RMP did not include any requirement to comply with state and federal air quality standards. (*Id.*; Second Am. Compl. ¶ 161, ECF No. 31.) SUWA does not allege the RMP violates FLPMA and confirmed as much at the hearing. (Opp'n 23–24, ECF No. 54; Second Am. Complaint ¶¶ 160–65, ECF No. 31.)

Gasco argues that SUWA's allegations do not make out a FLPMA claim because SUWA does not allege any inconsistency with the RMP. (Gasco's Reply 9–10, ECF No. 59.) The Court agrees.

The relevant part of 43 U.S.C. § 1732(a) states that "[t]he Secretary [of the Interior] shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under § 1712 of this title when they are available."[5] Parties typically allege only two causes of action under § 1732(a): (1) that some BLM action or inaction contravened the relevant RMP and (2) that some BLM action or inaction contravened § 1732(a)'s mandate to "manage . . . public lands under principles of multiple use and sustained

---

[4] SUWA also alleged FLPMA violations based on 43 C.F.R. § 2920.7(b)(3), (Second Am. Compl. ¶ 160, ECF No. 31), but later dropped that basis, (Opp'n 24 n.11, ECF No. 54).
[5] All parties agree the exception in § 1732(a) does not apply here. (BLM and Gasco's Joint Suppl. Br. 2, ECF No. 69; SUWA's Suppl. Br. 1, ECF No. 70.)

yield." *E.g.*, *Norton*, 542 U.S. at 67; *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 756–57 (D.C. Cir. 2007); *Or. Nat. Res. Council v. Brong*, 492 F.3d 1120, 1125–32 (9th Cir. 2007); *Or. Wild v. Bureau of Land Mgmt.*, No. 6:14-CV-0110-AA, 2015 WL 1190131, at *11–12 (D. Or. Mar. 14, 2015); *Williams v. Bankert*, No. 2:05CV503DAK, 2007 WL 3053293, at *7–8 (D. Utah Oct. 18, 2007); *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1289, 1299–1300, 1305, 1307–08 (10th Cir. 1999) (evaluating "whether the Secretary of Interior acted within his authority under . . . FLPMA [including § 1732(a)'s multiple use and sustained yield mandate] when he promulgated new regulations governing the administration of livestock grazing on public lands managed by the Bureau of Land Management"). SUWA makes neither of these claims.

The Court has not found any treatise or case where SUWA's allegations make out a cause of action under § 1732(a) nor has SUWA cited any such authority. (*See* Opp'n 23–24, ECF No. 54 (citing only to 43 U.S.C. §§ 1712(c)(8) and 1732(a) in support of its allegations).) Indeed, where parties have made similar claims, courts have rejected them as lacking a legal basis. *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 37–38 (D.D.C. 2014) (holding plaintiffs failed to state a claim when they alleged "that BLM violated FLPMA by failing to ensure its leasing decisions would result in compliance with federal air quality standards"); *WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 94 (D.D.C. 2012) (holding "neither the FLPMA nor the implementing regulations required BLM to analyze whether and to what degree the leasing of the WAII tracts would comply with national ozone, $PM_{10}$, and $NO_2$ standards.") Therefore, the Court dismisses SUWA's FLPMA claims. Because the Court dismisses SUWA's FLPMA claims based on Gasco's argument, the Court will not address the BLM's argument. If

SUWA wishes to replead its claim as against the RMP under 43 U.S.C. § 1712 it may attempt to do so within thirty days of entry of this Order.

## V.  CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART the BLM's and Gasco's Motions to Dismiss.  The Court dismisses all claims relating to the EA, the EIS, the ROD, and the Six-Well EA and DR/FONSI with prejudice.  The NEPA claims relating to the Sixteen-Well DR/FONSI survive the Motion to Dismiss.  The Court dismisses the FLPMA claims concerning the Sixteen-Well DR/FONSI without prejudice.

SO ORDERED this 17th day of July, 2015.

BY THE COURT:

EVELYN J. FURSE
United States Magistrate Judge